Ex. 7. These reasons supporting relief for the Class of 1986 apply with equal force to the Class of 1987.[10/]

On April 2, 1985, the Assistant Secretary of Defense for Manpower, Installation and Logistics stated that USUHS students were entitled to four years' credit for retired pay:

> The Office of the Secretary of Defense has concluded that the students' request for redress with regard to the four years as a student being credited for computation of retired pay is valid as a matter of law. Accordingly, this credit should be granted administratively without referral to the Boards for Correction of Military and Naval Records. (Emphasis added.)

Ex. 5. Since this credit has not yet been administratively granted to the petitioners, it is respectfully requested that this Board take appropriate action to implement such credit.[11/]

---

10/ Indeed, several members of the Class of 1987 also applied for entry into the Class of 1986. These applicants attended briefings and interviews for the Class of 1986, and received the 1981-82 or 1982-83 USUHS Bulletin. They received the same erroneous DOPMA information as applicants for the Class of 1986, as they did for the Class of 1987. Ex. 8, pp. 1-2.

11/ Counsel for petitioners is advised that Army and Air Force members of the Class of 1987 have received this credit.

## I. THE CLASS OF 1987 IS INDISTINGUISHABLE FROM THE CLASS OF 1986 AND SHOULD THUS BE GRANTED THE SAME RELIEF.

The Class of 1986 (which was granted the relief here sought by the Class of 1987) was either not advised, or incorrectly advised, of the DOPMA changes by: (1) the USUHS Bulletin; and (2) the briefings by Mr. Peter J. Stavish (USUHS Registrar) and his staff. Moreover, the USUHS letter accepting members of the Class of 1986 said nothing about the DOPMA changes. As will be seen below, the Class of 1987 received precisely the same misinformation.

### A. The 1983-1984 USUHS Bulletin Stated That The Class Of 1987 Would Receive Longevity Credit.

The 1983-1984 Bulletin states (as did prior Bulletins) that "longevity credit for pay purposes accrues for students for time spent in school." Ex. 9, p. 45.[12/] Appendix A of the Bulletin reflects similar information: "Service performed while a member of the program shall not be counted . . . in computing years of service creditable under section 205, other than subsection (a)(7) and (8), of Title 37." Ex. 9, p. 192, Section 2126. However, Subsection (A)(7) of 37 U.S.C. §205 reflected that medical officers were an exception

12/ "The text for the Uniformed Services University School of Medicine Bulletin 1983-1984 was written in December 1982 and failed to include the revisions of DOPMA...." Ex. 10, p. 1. The Bulletin typically goes to press in January and is published in April.

to the general rule, and stated that four years' service creditable toward basic pay was awarded to commissioned medical officers.13/ The 1982-83 Bulletin, which was sent to the Class of 1986 (and many members of the Class of 1987), contained - verbatim - the same misinformation as the 1983-84 Bulletin. Ex. 11, pp. 45, 168.

It would not have been reasonable to expect the Class of 1987 to know of the DOPMA changes. First. The list of public laws in the 1983-1984 Bulletin does not include the DOPMA revision in question.14/ In sharp contrast, the DOPMA longevity credit changes are correctly stated in the 1984-1985 Bulletin (Ex. 12, pp. 32, 166) and in all subsequent years. Second. Even if the Class of 1987 had been able to discover the DOPMA revision, which struck out Subsections (A)(7) and (8) -- these subsections were still (erroneously) listed in the 1983-1984 Bulletin, thus indicating that they were still in effect. Ex. 9, p. 192. Thus, there was no way that a person reading the 1983-1984 Bulletin could discover the DOPMA changes; indeed, the Bulletin contained only the pre-DOPMA language. In contrast, the 1984-1985 Bulletin (and all subsequent Bulletins) clearly set out the DOPMA longevity credit changes, so that the Class of 1988 (and all subsequent

13/ See 37 U.S.C.A. §205, Historical and Statutory Notes, 1980 Amendments, p. 780.

14/ DOPMA (Public Law 96-513) is absent from the list of added or amended public laws. Ex. 9, p. 192.

classes) were made fully aware of these DOPMA changes.[15/] Ex. 12, pp. 32, 166. Finally, the 1982-1983 Bulletin for the Class of 1986, which was awarded longevity credit, is worded verbatim with the 1983-1984 Bulletin in both the benefits section and the appendix. Ex. 11, pp. 45, 168.

B. The Briefings By The USUHS Registrar, Peter J. Stavish, And His Staff To The Class of 1987 Either: (1) Gave Erroneous DOPMA Information On The Longevity Service Credit; Or (2) Were Silent On The DOPMA Issue.

1. The group briefing sessions.

Each prospective student invited for an interview attended a briefing session about USUHS. Each briefing session consisted of a film presentation, a group briefing, and individual interviews. The briefings of the Class of 1987 took place between October 1982 and March 1983. The USUHS Registrar and Director of Admissions, Mr. Peter J. Stavish, conducted most of these briefing sessions, and he was responsible for informing the Class of 1987 of the changes to DOPMA. If it was not convenient for Mr. Stavish to conduct the briefing, one of his colleagues did so. The group briefing (excluding the film) generally took about 25-

15/ "In the fall of 1983, having recognized the error in the 1983-1984 Bulletin, the University revised the 1984-1985 Bulletin...." Ex. 10, p. 2.

30 minutes and attempted to address at least 37 separate issues.[16/] Ex. 13. Accordingly, not all issues could be covered due to the limited time.

While the contents of the briefings varied, they were erroneous with respect to the DOPMA issue.[17/] The briefing information on the DOPMA issue fell into the following general categories. (1) Nothing was said about DOPMA impact upon basic pay, and the errors in the Bulletin regarding basic pay were not mentioned. Ex. 8, p. 2; Ex. 14, pp. 2-3; Ex. 15, p. 1. All of the briefings conducted by Mr. Stavish's colleagues fell into this category,[18/] as did many of Mr. Stavish's own briefings. (2) The briefer said that one DOPMA item or another was "changing", "in flux", was "being addressed", or was subject to "potential change"[19/] -- and that although the 1983-1984 Bulletin was "not entirely correct", the interviewees should not be concerned because "these matters would be corrected by the time of

16/ The DOPMA impact on USUHS was not included as one of the 37 issues. Ex. 13.

17/ The briefings given to both the Class of 1986 and the Class of 1987 gave either erroneous DOPMA information or no information at all. Ex. 8, pp. 1-2.

18/ "When the Director of Admissions [Mr. Stavish] was not available, the alternative briefer did not include [the DOPMA] material, but rather did a standard briefing without reference to the DOPMA changes . . . ." Ex. 10, p. 1.

19/ Ex. 8, p. 2; Ex. 16, p. 1.

matriculation."[20] Ex. 15, p. 1; Ex. 16, p. 1. Alternatively, the briefer stated that a "change was made in error and would soon be corrected", and that the Class of 1987 "would be treated the same way as the Class of 1986."[21] Ex. 17, p. 1. (3) The briefer stated that DOPMA was being "mistakenly applied to USUHS students and the matter was in the process of being fixed -- that the matter would be corrected by matriculation and would not affect USUHS". Ex. 15, p. 1; Ex. 17, p. 1. In summary, the interviewees were either: (1) not told of the DOPMA changes; (2) were incorrectly advised of the DOPMA changes; or (3) were advised that the DOPMA issue would be corrected by the time of matriculation and would not affect them.[22]

That many of the briefings omitted any mention of the DOPMA changes is confirmed by the briefing outlines used by

---

20/ USUHS made at least two legislative attempts to change the law back to pre-DOPMA credit for the four years spent at USUHS.

21/ There was considerable legislative activity in 1982 and 1983 to amend DOPMA to restore the four years' longevity and retirement credit. This probably accounts for these excessively optimistic -- and unwarranted -- briefing comments.

22/ It may be noted that these briefing sessions were designed to aggressively recruit applicants -- and that competition with other medical schools for these outstanding students was intense. This recruiting pressure may, in part, explain why the Class of 1987 was misinformed.

Mr. Stavish and his colleagues.[23] Although the briefing outline for the Class of 1987 was revised[24], it still made no mention of any DOPMA changes. Ex. 13. This is in sharp contrast to the briefing outline for the Class of 1988, which instructs the briefer to "stress the fact that four years of student status at the School of Medicine is no longer counted for pay purposes after medical school or at retirement." Ex. 18, p. 4, V.3.d.[25]

In summary, it seems clear that the Class of 1987 was misçounseled. As with the Class of 1986, they failed to

---

23/ "During the typical Admissions interview day, each applicant was interviewed separately by two active duty medical officers [or USUHS civilian medical staff]. However, the interviewers were not specifically requested to clarify DOPMA during the interview, and it is equally likely that the interviewers incorrectly briefed the applicants on the service credits because the interviewers were not affected by the DOPMA changes in longevity credit for time spent in medical school. . . . [A] great number of active duty medical officers serve as interviewers, and [they] perform this function on an infrequent basis." Ex. 10, pp. 1-2. Other potential sources of DOPMA information, such as HPSP recruiters, detailers, career counselors, personnel centers and ROTC units, were not knowledgeable about the DOPMA impact. Ex. 7, p. 2; Ex. 14, Landers statement, p. 2; Ex. 16, p. 4.

24/ The handwritten changes constitute these revisions.

25/ Although this outline is not formally dated, the date can be deduced by reference to paragraph 5 of a December 26, 1985, Memorandum from the USUHS Dean, which states that "The impact of DOPMA was specifically stressed in the . . . briefings". Ex. 10, p. 2.

00141

receive correct DOPMA information. Ex. 8, pp. 1-2; Ex. 14, pp. 2-3 and Landers statement; Ex. 15, p. 1; Ex. 16, p. 1; Ex. 17, pp. 1-2.

2. Mr. Stavish's three inconsistent statements.

There is clear evidence that missing information and misinformation plagued the Registrar's office at the time. Mr. Stavish himself wrote three separate memorandums to the Correction Boards regarding the DOPMA issue and its inclusion in the briefings of the Class of 1987. His first memorandum of 12 February 1985, reflecting his initial understanding of the situation as it related to the Class of 1987, stated that:

> It cannot be said that all persons who were interviewed understood or paid attention to what was being said; however, the Office of Admissions went to extreme length to verbally inform all interviewees of the new legislation.

Ex. 19. In his second memorandum, which was written on the same day as the first memorandum, 12 February 1985, Mr. Stavish receded considerably from the position he stated in his first letter:26/

26/ The substantive difference between these two memorandums, both written on the same day, is inexplicable.



00142

> It cannot be said that every interviewee was told the exact information on each interview day. On three occasions I did not personally give the briefing to the interviewees; two of the briefings were conducted on the west coast (which I did not attend) and one was given on the east coast, which I did not attend because I was out on the west coast. Therefore, it is possible that a handful of applicants did not get the word about the new legislation.27/

Ex. 20. In his third memorandum, dated 18 April 1985, Mr. Stavish backed away even further from his initial position, and stated that:

> It cannot be said that every interviewee was told the exact information on each interview day. On three occasions I did not personally give the briefing to the interviewees; two of the briefings were conducted on the west coast (which I did not attend) and one was given on the east coast, which I did not attend because I was out on the west coast. It is very possible that a given segment of the Class of 1987 could have, and probably did, receive inaccurate or incomplete information from any number of official/semi-official sources concerning the effects upon entitlements (pay purposes at the time of graduation and retirement) due to the DOPMA legislation. All this obviously has resulted in a confused and misinformed population.

Ex. 22.

27/ At least 32 of the 156 members of the Class of 1987 were not briefed by Mr. Stavish. Ex. 21. This represents over 20% of the Class, and constitutes more than a "handful". And, the USUHS Dean stated that those not briefed by Mr. Stavish were incorrectly briefed. Ex. 10, p. 1.



00143

Mr. Stavish's inability to consistently view the past led to a need for final clarification of the matter by the USUHS Dean, Dr. Jay P. Sanford. The Dean said, in essence, that Mr. Stavish himself had either: (1) not briefed the Class of 1987 on the DOPMA issue; or (2) gave erroneous information regarding the DOPMA impact:

> From meetings with members of the Class of 1987 who would have had specific reason to listen carefully for material re DOPMA, i.e., those with prior line service, I am now convinced that even at some of the briefings presented by the Director of Admissions that specific details regarding service creditable for basic pay were not included or that a change in this aspect of DOPMA was implied.

Ex. 23. It seems clear that Mr. Stavish did not understand, with any reasonable degree of certainty, what transpired during the events in question, and it was left for the Dean to take corrective action. Id.

In sum, Mr. Stavish recanted, in his second and third memorandums, much of what he said in his first memorandum of 12 February 1985.[28/] Subsequently, the USUHS Dean said that Mr. Stavish himself had either not briefed the Class of 1987

---

28/ Mr. Stavish's progressive weakening of his own memoranda went from informing: (1) "all interviewees" to (2) all but a "handful" to (3) all but a "given segment", and, finally, to (4) a description of the Class of 1987 as a "confused and misinformed population".

or gave them inaccurate information. In these circumstances, it is fair to conclude that Mr. Stavish either did not brief the Class of 1987 on the DOPMA changes or briefed them incorrectly. Mr. Stavish admitted that the Class of 1986 was briefed incorrectly regarding the DOPMA changes. Ex. 1. There can be no doubt that his own statements regarding the Class of 1987 demonstrate an incomplete understanding of the relevant events. That he misinformed the Class of 1987 is clear. The only support for Mr. Stavish's characterization of his briefings to the Class of 1987 are his own progressively watered down statements, and nothing else.

These statements are the only difference between the Class of 1986 and the Class of 1987. All other circumstances are the same. That this putative "difference" should control or affect whether relief is granted seems quite inappropriate.[29/]

C. The USUHS Acceptance Letters Did Not Contain Any DOPMA Information.

Successful candidates for admission to USUHS received two acceptance letters. The first is a letter of conditional acceptance (Ex. 24); the second is a letter of unconditional acceptance. Ex. 25. A prospective student signified his

29/ The BCNR's denial of relief to the Class of 1987 relied, in large measure, on Mr. Stavish's February 12, 1985, statement. Ex. 4. Petitioners herein respectfully request the BCNR to reconsider the weight properly accorded Mr. Stavish's statement.

00145

intent to attend USUHS by signing a USUHS acceptance form and returning it to the School. Ex. 26. None of these three documents which USUHS sent to the Class of 1987 contained any DOPMA information, and were identical to the documents sent to the Class of 1986. This is in sharp contrast to the unconditional acceptance letter for the Class of 1988, which contains a clear statement that the four years at USUHS will not count toward longevity upon graduation. Ex. 27, p. 1. For the Class of 1989, and all subsequent classes, this DOPMA information was included in the conditional acceptance letter.[30/]

In summary, since neither the Bulletin, the briefings nor the acceptance letters informed the Class of 1987 of the DOPMA changes, the petitioners herein were not aware of these DOPMA changes until after they matriculated. Ex. 8, p. 4; Ex. 14, p. 6; Ex. 15, p. 4; Ex. 16, p. 3; Ex. 17, p. 2. It is likewise clear that the Class of 1987 did not receive the accurate DOPMA information which the Class of 1988 received.

30/ "A letter was sent to each prior service matriculant of the Class of 1988 in June 1984 prior to matriculation . . . . In 1985 such a letter was sent to each matriculant at the time of initial conditional acceptance." Ex. 10, p. 2.

## II. ACCEPTANCE OF USUHS TERMINATED ALL OTHER ALTERNATIVES.

As soon as a prospective student received an unconditional acceptance from USUHS, the AMCAS rule[31] (that only one unconditional acceptance may be held at any given time) required these students to withdraw any other unconditional acceptances.[32] This action was, of course, taken long before the students learned of the DOPMA changes. Ex. 7, p. 1; Ex. 8, p. 4; Ex. 14, p. 6; Ex. 15, p. 4; Ex. 16, p. 3; Ex. 17, p. 2. The AFBCMR characterized the students' dilemma as follows:[33]

> Therefore, at time of final acceptance, if they wanted to attend medical school they were forced into a position of accepting the USUHS offer as all other options were then closed. The class feeling is that the rules were changed after ensuring no other options were left. For students who were already on active duty, each student interviewed would have pursued other career options (e.g., pilot training, medical school on G.I. Bill while staying in Reserves) rather than lose that four years altogether.

[31] Virtually all accredited medical schools are members of AMCAS, the American Medical College Application Service. AMCAS supervises (and controls) the medical school admissions process.

[32] USUHS rigorously enforced the AMCAS rule. Ex. 28.

[33] Although this analysis addressed the Class of 1986, it applies with equal force to the Class of 1987.



00147

Ex. 7, p. 1. Simply put, the students relied on the USUHS counseling to their disadvantage.

Since the Class of 1987 was composed of the top layer of applicants to all medical schools, they were awarded other scholarships (including the Armed Forces Health Professions Scholarship Program), and those with former military service were eligible for the G.I. Bill.34/ Ex. 16, p. 2. Students who owned homes with low mortgage interest rates or rented apartments or homes in less expensive areas than Washington, D.C. could have attended medical schools close to their homes. Ex. 8, pp. 2-3; Ex. 14, p. 3; Ex. 15, pp. 2-3; Ex. 16, p. 2.

Medical school tuition and fees in 1983 ranged from $3,000 to $4,500 at highly regarded state medical schools.35/ In short, affordable tuition costs, combined with scholarships available at these medical schools and HPSP

34/ The prior-service students also could have remained in, or transferred to, the Reserves while in medical school, thereby obtaining four years of creditable service and a lesser active-duty commitment as a Reserve Officer upon graduation.

35/ Approximate tuition and fees, at a sampling of state medical schools in 1983, were as follows: University of Utah - $3,000; Ohio State University - $3,700; Wright State University - $3,800; University of Maryland, nonresident - $4,000; Medical University of South Carolina - $4,000; University of Wisconsin - $4,000; and Medical College of Ohio - $4,500. See, Ex. 8, p. 3; Ex. 14, p. 3; Ex. 15, p. 3; Ex. 16, p. 2.

scholarships,[36/] clearly offered the students selected by USUHS a financially viable alternative to USUHS.

Further, acceptance by USUHS brought the careers of prior-service officers to a halt. Their career status was terminated, and they were removed from favorable consideration for any career enhancing programs.[37/] Those attending the Naval Academy were required to give up other highly sought after training programs that they had successfully competed for. Finally, a decision to attend USUHS meant that civilian job opportunities were declined and resignations from civilian jobs ensued.

The above career limiting consequences took place either before or upon accepting admission to USUHS.[38/] Regrettably, these decisions were made without the benefit of knowing that the DOPMA changes would be applied to the Class of 1987, but after all alternative career opportunities were foreclosed. Simply stated, the Class of 1987 was forced to "burn its bridges" before being advised of DOPMA.

---

36/ Members of the Class of 1987 were awarded, and turned down, these scholarships. See, e.g., Ex. ~~16~~, p. 2.

37/ This resulted in the loss of significant remuneration, such as the aviation incentive bonus of $5,000 per year, and the nuclear power bonus of $6,000 per year. Ex. 8, p. 4; Ex. 14, p. 6.

38/ At least one student, who held a doctorate in pharmacology, would have obtained advanced standing in medical schools other than USUHS. Ex. 15, p. 2. Similarly, another student had a doctorate in microbiology. (John A. Powell, Army Service No. 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.)



00149

## III. THE CLASS OF 1987 HAS BEEN TREATED UNJUSTLY.

The training of officers attending USUHS provides stability to the medical corps. The current active duty obligation after completion of medical school is seven years.[39] Counting both this initial seven year active duty obligation (from USUHS) plus the internship year and residency years, the average USUHS graduate will serve on active duty at least 11 years. Thus, an officer from USUHS is obligated to more pay back time than any other active duty officer who undergoes any other training program while on active duty.[40]

At the same time, USUHS students are not promoted for the four years while they are in medical school.[41] From the admission of the first class in 1976 to and including the Class of 1986, an officer at USUHS graduated as an O-3 with four years of longevity for pay purposes. In contrast, the Class of 1987 (assuming no prior military service) graduated

39/ This is the maximum statutory obligation.

40/ In contrast, the HPSP active duty obligation is only four years, notwithstanding the fact that HPSP recipients received a monthly stipend of approximately $550 (in addition to tuition, books, fees, etc.) even though they were not on active duty while they attended medical school. Ex. 16, p. 2.

41/ Prior-service officers reverted back to O-1 (in some cases from O-4), with former O-4s losing as much as $100,000 during the four years of medical school. Ex. 14, p. 6; Ex. 18, p. 4.

as an O-3 with no time credited for longevity. This disparity will continue throughout their entire active duty careers.42/

The Class of 1987 is at the lower end of a two-tier pay scale. As O-3s with zero years of credible service, they will receive approximately $6,000 less per year in basic pay than any other active duty health-care officer who has been commissioned for four years, including the Class of 1986. This represents a pay cut of approximately 20%. Throughout their careers, USUHS graduates will almost always be at the bottom of the pay scales regardless of rank or accomplishment when compared with officers who entered upon active duty at the same time. This lack of creditable service for pay at USUHS will cause substantial differences in career incomes between these medical officers and all other line or staff officers.

Moreover, officers on active duty who attend full-time, post graduate programs receive full credit for pay, longevity, promotion, and retirement.43/ For example,

---

42/ The Class of 1987 will earn less than the vast majority of officers who have no specialized training beyond the undergraduate level and little or no military vocational training.

43/ A masters program would generally require two years of school; a Ph.D. program could take from two to four years. Thus, many officers currently receive masters degrees to teach at the Service Academies, and some return for their Ph.D. degrees -- thus receiving up to six years' education and full credit for pay, longevity, promotion and retirement.

officers detailed to accredited law schools to obtain a law degree receive full credit for all time spent at law school.44/ In addition, from the moment a naval officer enters the naval aviation career pipeline, he receives flight pay in addition to pay, allowances, and creditable time for promotion, and longevity credit for pay and retirement. These benefits are given despite the fact that he will not be a fully productive fleet pilot for at least two years, and that his training costs substantially more than medical school.45/

In sum, granting relief would merely put the Class of 1987 on a parity with officers attending all other active duty training programs. In no other advanced degree programs do officers not accrue longevity credit while in school on active duty.46/ The USUHS Class of 1987 should be no exception, because they were not advised of the DOPMA changes before they accepted their appointment to USUHS and they "burned their bridges".

44/ Moreover, programs at the Naval post graduate school in Monterey, California, are a springboard for an entirely different career field. Some of these programs are three years long.

45/ This analysis applies with equal force to nuclear propulsion officers and other analogous career fields which require lengthy classroom training and on-the-job training in order to obtain the requisite skill level.

46/ Indeed, there is no other program in the military where active duty officers are not given longevity credit for their active duty service.

This dilemma is even more puzzling because USUHS students serve on active duty while they are in medical school. They must meet academic and physical requirements for service as active duty officers, are subject to the Uniform Code of Military Justice, and are otherwise accorded the rights, benefits, and responsibilities of active duty officers. USUHS is not an undergraduate service academy and USUHS students are commissioned officers, not cadets or midshipmen.47/ Simply put, the Doctor of Medicine degree is a graduate degree, and active duty officers in all other graduate programs earn full longevity credit.

CONCLUSION

It is clear that the USUHS President and Dean believes that the Class of 1987 is in the same situation as the Class of 1986: "the circumstances presented with these petitions, i.e., incorrect information in the Bulletin, briefings when the issue was not clarified and interviews with active duty medical officers where the issue may have been confounded, are substantially similar to the facts presented by the Class of 1986 petitions." Ex. 23. The Dean concluded that the Class of 1987 was entitled to the same relief as the Class of 1986: "I recommend that the Board consider en bloc

47/ USUHS students "serve on active duty in pay grade 0-1 with full pay and allowances of that grade". 10 U.S.C. §2114(b).

correction of this error as it did for the Class of 1986." Id. Indeed, Mr. Stavish (the USUHS Registrar) stated that the Class of 1987 "would be treated the same way as the Class of 1986." Ex. 17, p. 1.

To this end, a 4 June 1986 recommendation from the Head of the Officer Plans and Community Management Branch to the Chairman, Board for Correction of Naval Records, recommended that the relief requested herein be granted to a member of the Class of 1987. The recommendation stated that:

> While it is clear the petitioner did not enroll in the program prior to the effective date of DOPMA, sufficient documentation is provided by the petitioner to indicate he was probably provided with misinformation during his recruitment. In the interest of fairness, I recommend that ENS [Timothy L.] Workman's petition be granted.

Ex. 29. In the circumstances set forth hereinabove, it is respectfully requested that petitioners be granted the same relief afforded the Class of 1986.48/

48/ "Lack of information or misinformation regarding DOPMA will not be an issue for the Class of 1988 and on, since the [impact of DOPMA] has been incorporated in the current Bulletins, is briefed and covered in the conditional acceptance letter." Ex. 10, p. 2.

00154

Respectfully submitted,

Jeffrey M. Glosser
Attorney for Petitioners

WHITEFORD, TAYLOR & PRESTON
888 - 17th Street, N.W.
Suite 400
Washington, D.C. 20006
(202) 835-0606

Dated: ______________

00155

# LIST OF EXHIBITS

Exhibit No.

1. Memorandum For The Record, 3 April 1984, from Peter J. Stavish (re the USUHS Class of 1986)
2. BCNR 15 August 1985 grant of relief to the USUHS Class of 1986
3. Navy JAG 5 August 1985 opinion to the BCNR
4. BCNR 15 August 1985 denial of relief to the USUHS Class of 1987 (petitioner Cheeseman)
5. Assistant Secretary of Defense Directive, 2 April 1985
6. OASD letter, 3 September 1982, to USUHS
7. Air Force advisory opinion to AFBCMR, 27 February 1985
8. Affidavit of petitioner Edward William Cheeseman, Jr., 8 September 1989
9. 1983-1984 USUHS Bulletin, pp. 45, 192
10. Memorandum from Jay P. Sanford, M.D., President/Dean, USUHS, December 26, 1985
11. 1982-1983 USUHS Bulletin, pp. 45, 168
12. 1984-1985 USUHS Bulletin, pp. 32, 166
13. Peter J. Stavish 1983 briefing outline ("1983 Interview Program")
14. Affidavit of petitioner James Donald Bridges, 23 September 1989, with 5 May 1987 statement from LCDR Paul K. Landers
15. Affidavit of petitioner Christopher Robert Turner, 8 August 1989
16. Affidavit of petitioner Timothy Lee Workman, 3 August 1989

17. Affidavit of petitioner Tremont Vincent Parrino, 23 August 1989

18. Peter J. Stavish 1984 briefing outline ("1984 Interview Program")

19. Memorandum For The Board Of Corrections, 12 February 1985, from Peter J. Stavish (re the Class of 1987)

20. Memorandum For The Board Of Corrections, 12 February 1985, from Peter J. Stavish (re the Class of 1987)

21. Members of the Class of 1987 not briefed by Peter J. Stavish

22. Memorandum For The Board Of Corrections, 18 April 1985, from Peter J. Stavish (re the Class of 1987)

23. Memorandum For Board of Correction of Naval Records, December 5, 1986, from Jay P. Sanford, M.D., President/Dean, USUHS

24. USUHS letter of conditional acceptance to a member/petitioner of the Class of 1987, 3 December 1982

25. USUHS letter of unconditional acceptance to a member/petitioner of the Class of 1987, 27 January 1983

26. USUHS Student Acceptance Form for the Class of 1987, January 28, 1983 (petitioner Turner)

27. USUHS letter of unconditional acceptance to a member of the Class of 1988, 27 June 1984

28. USUHS letter to a member/petitioner of the Class of 1987, 19 May 1983

29. Recommendation that the BCNR grant relief to a member/petitioner of the Class of 1987, 4 June 1986, from Head, Officer Plans and Community Management Branch

00157