# In the United States Court of Federal Claims

No. 06-685 C

(Filed March 27, 2008)

| | | |
|---|---|---|
| * * * * * * * * * * * * * | * | |
| JOHN D. BOYER, | * | Military Pay; Defense Officer Personnel |
| | * | Management Act, Pub. L. No. 96-513, |
| *Plaintiff*, | * | § 402, 94 Stat. 2835, 2904 (1980); 32 |
| | * | C.F.R. § 723.3(e)(4) (2003); Arbitrary and |
| v. | * | Capricious Standard of Review; Deference |
| | * | to a Military Records Correction Board; |
| THE UNITED STATES, | * | Equal Protection under the Due Process |
| | * | Clause of the Fifth Amendment; Service |
| *Defendant*. | * | Credit for Medical School. |
| * * * * * * * * * * * * | * | |

*David P. Sheldon*, Washington, D.C., for plaintiff.

*Meredyth D. Cohen*, United States Department of Justice, with whom were *Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Franklin E. White, Jr.*, Assistant Director, Washington, D.C., for defendant. *Lieutenants Brian Halliden* and *John Clady*, Office of the Judge Advocate General, United States Navy, of counsel.

---

## OPINION

---

**Bush**, *Judge*.

This military pay case is before the court on cross-motions for judgment on the administrative record. An administrative record (AR) was filed on August 15, 2007, and the parties' cross-motions have been fully briefed. Oral argument was heard on March 14, 2008. For the reasons stated below, defendant's motion is granted.

## BACKGROUND[1]

Plaintiff was appointed an Ensign in the United States Navy on April 5, 1983. AR at 121. He matriculated at the Uniformed Services University of the Health Sciences (USUHS) in August 1983 as a medical student and graduated in May 1987 as a member of the class of 1987. *Id.* at 95. Dr. Boyer entered active duty in the Navy on June 15, 1987. Compl. ¶ 26.

Plaintiff applied for correction of his military records on October 2, 1989, to reflect constructive service credit (CSC) for his years in medical school. AR at 122-23. The Board for Correction of Naval Records (BCNR) denied his request, citing the Defense Officer Personnel Management Act, Pub. L. No. 96-513, § 402, 94 Stat. 2835, 2904 (1980) (DOPMA), as denying such credit to members of his class at USUHS. AR at 113. Plaintiff applied for four years of CSC again, in 1992 and 2003, and his requests were denied each time by the BCNR. Compl. ¶¶ 31-34. In its final denial dated February 12, 2004, the BCNR again cited DOPMA as precluding CSC for plaintiff's years at USUHS, and stated that "the circumstances of [Dr. Boyer's] case fail to show that [Dr. Boyer] suffered an injustice." AR at 1. The decision also referenced plaintiff's arguments in support of his application, which will be discussed *infra*.

Dr. Boyer received promotions while in the Navy, achieving the ranks of Lieutenant, Lieutenant Commander and Commander. Compl. ¶ 27. He eventually completed his required service, resigned from active duty and received an Honorable Discharge effective July 2, 2001. *Id.* ¶ 28. This date marks his final separation from the Navy. *Id.* ¶ 13.

Dr. Boyer filed suit in this court on October 2, 2006, and amended his complaint on May 1, 2007. Plaintiff seeks "back pay, allowances, and other benefits [related to] four years of constructive service credit (CSC) for the period during which he attended the Uniformed Services University of the Health Sciences." Compl. at 10. Defendant, on the other hand, argues that the BCNR "correctly determined that [Dr. Boyer] was not entitled to constructive service credit." Def.'s Mot. at 10.

---

[1]/ The facts upon which the parties rely are undisputed unless otherwise noted.

## DISCUSSION

### I. Jurisdiction

Pursuant to the Tucker Act, the United States Court of Federal Claims has jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2000). The Tucker Act, however, "does not create any substantive right enforceable against the United States for money damages. The Court of Claims has recognized that the Act merely confers jurisdiction upon it whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398 (1976) (citation omitted). A plaintiff coming before the United States Court of Federal Claims, therefore, must also identify a separate provision of law conferring a substantive right for money damages against the United States. *Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) (citing *Testan*, 424 U.S. at 398).

In the present case, plaintiff alleges that the Military Pay Act, 37 U.S.C. § 204 (2000), provides the money-mandating provision of law because he is requesting back pay and allowances. Claims for back pay based on § 204 are within the jurisdiction of this court. *Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006). Thus, jurisdiction lies for this suit.

### II. Judgment on the Administrative Record

Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC) provides for judgment on the administrative record. To review a motion, or cross-motions, under RCFC 52.1, the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). The court must make fact findings where necessary. *Id.* The resolution of RCFC 52.1 cross-motions is akin to an expedited trial on the paper record. *Id.*

## III. Standard of Review for Decisions of Boards for Correction of Military Records

The court does not review the issue before a board for correction of military records *de novo*, rather, this court "will not disturb the decision of the corrections board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005) (citing *Haselrig v. United States*, 333 F.3d 1354, 1355 (Fed. Cir. 2003)). "This [standard of review] necessarily limits the Court of Federal Claims' review to the administrative record," except in extremely limited circumstances. *Metz*, 466 F.3d at 998 (citing *Cunkelman v. United States*, 229 Ct. Cl. 857, 858 (1982)); *see also Long v. United States*, 12 Cl. Ct. 174, 177 (1987) (stating that "'the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court'" (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985))). Plaintiff's burden is to show by "'cogent and clearly convincing evidence'" that the decision of the board fails this standard. *Wronke v. Marsh*, 787 F.2d 1569, 1576 (Fed. Cir. 1986) (quoting *Dorl v. United States*, 200 Ct. Cl. 626, 633 (1973)). Plaintiff must also overcome the presumption of regularity which attaches to the actions of the BCNR. *See Richey v. United States*, 322 F.3d 1317, 1326 (Fed. Cir. 2003) (noting "the presumption of regularity that attaches to all administrative decisions" of the United States (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001))). Thus, "[t]he burden of overturning a military board decision is a heavy one." *French v. United States*, 42 Fed. Cl. 49, 56 (1998) (citations omitted); *see, e.g.*, *Harris v. United States*, 14 Cl. Ct. 84, 90 (1987) (noting "the heavy burden" borne by such plaintiffs) (citations omitted).

## IV. Analysis

Plaintiff raises five arguments in support of his contention that the BCNR decision denying him CSC for his years in medical school must be overturned by this court. Plaintiff first contends that the BCNR failed to address one of his arguments for corrective action, namely, that the BCNR should grant him relief because the Army Board for Correction of Military Records (ABCMR) had granted similar relief to some of his classmates in medical school. Pl.'s Mot. at 5-6; Pl.'s Reply at 3-5. Second, plaintiff asserts that the "BCNR failed to correct an injustice clearly presented in the record." Pl.'s Mot. at 6; Pl.'s Reply at 5. Third,

plaintiff argues that the "BCNR's decision was not based upon any evaluation of Plaintiff's individual circumstances." Pl.'s Mot. at 7; *see also* Pl.'s Reply at 6. Fourth, plaintiff suggests that the "BCNR improperly disregarded the sworn statements of Plaintiff." Pl.'s Mot. at 7; Pl.'s Reply at 7. These four arguments share the common characteristic of plaintiff pointing out some flaw in the consideration of his application by the board, and for this reason, the court will consider these arguments under a common standard. Finally, Dr. Boyer contends that his rights under the Due Process Clause of the Fifth Amendment of the United States Constitution were violated by the BCNR decision. Pl.'s Mot. at 8-9; Pl.'s Reply at 8-9.

As a threshold issue, it is important to review the changes brought about by DOPMA and how those changes affected the classes of 1986 and 1987 at USUHS. Prior to September 15, 1981, the effective date of DOPMA, "students at USUHS who became military medical officers were entitled to CSC, so their four years of medical school were creditable for the computation of their basic pay." Pl.'s Facts ¶ 4. DOPMA ended that benefit as of September 15, 1981. DOPMA contained a grandfather provision, however, which extended the CSC benefit to medical students already enrolled at USUHS at the time of the effective date of DOPMA, which affected the classes of 1985 and earlier. The statutory extension of the CSC benefit ended with the class of 1985; thus, members of the class of 1986 had no statutory right to the CSC benefit enjoyed by their predecessors. *Id.*; *see also* DOPMA, Pub. L. No. 96-513, § 625(b)(2), 94 Stat. 2835, 2952 (1980).

According to the BCNR, members of the class of 1986 later obtained correction of their military records to reflect CSC for their years at USUHS:

> [The records correction for Navy members of the class of 1986] is due to the unique circumstances of those petitions which show[] that they were recruited during the early 1982 time frame and commenced school in 1982. . . . [Also,] [t]he Air Force and Army correction boards had previously granted relief to Air Force and Army personnel in the USUHS Class of 1986, and to not do the same for the Navy personnel would have resulted in a clear inequity. The Army board also granted relief to scholarship students who graduated in 1986.

AR at 1-2. Thus, it appears from the record that the Air Force, Army and Navy boards awarded CSC to each member of the USUHS class of 1986 who requested it. *See* Pl.'s Facts ¶ 4 (describing these corrections as "blanket relief" for "all" of the USUHS class of 1986). According to plaintiff's submissions to the BCNR, the mechanism used to obtain CSC for the class of 1986 was for the military boards to amend the students' enrollment dates at USUHS to reflect enrollments as of September 14, 1981, what is described in the record as a "legal fiction[]," to replace the student's actual enrollment dates in 1982. *See* AR at 16, 123.

It is not perfectly clear from the record why all three military boards of correction granted what plaintiff terms "blanket relief" to the USUHS class of 1986. In a memorandum dated December 5, 1986, Dr. Jay P. Sanford, Dean of the medical school at USUHS, noted that communication regarding the CSC benefit and DOPMA changes affected the incoming students of the classes of 1986 and 1987 and included "incorrect information in the [USUHS] Bulletin, briefings when the issue was not clarified and interviews with active duty medical officers where the issue may have been confounded." AR at 85. The record supports a conclusion that one reason that some of the members of the USUHS class of 1986 received CSC credit was that misinformation regarding the CSC benefit was being circulated at the time they were choosing which medical school to attend. *See* Pl.'s Facts ¶ 4 (alleging that the class of 1986 "matriculated based on faulty misrepresentations of CSC"). But the record also supports a conclusion that other members of the class of 1986 received CSC for a different equitable reason: once the Air Force Board for Correction of Military Records (AFBCMR) had granted relief to that service branch's applicants, the other boards felt compelled to follow suit. *See* AR at 87 (Letter of Charles R. Mannix, USUHS General Counsel, dated September 29, 1998) ("We found that after the Air Force BCMR approved their 1986 students, the Army and Navy BCMR's were obliged to follow in the interest of equity, justice, morale and retention . . . ."). For whatever reason relief was granted, the record supports the inference that membership in the USUHS class of 1986 was sufficient, without proof of individual circumstances pointing to misinformation received regarding CSC, to obtain CSC from a military board. *See* Def.'s Mot. at 8 (noting that the Army, Air Force and Navy boards had all provided "blanket relief" to their personnel in the USUHS class of 1986).

For the USUHS class of 1987, also totally bereft of a statutory right to CSC because of the passage of DOPMA, it does not appear that blanket relief was given

to applicants appearing before either the Army or Air Force boards. *See* AR at 87 (Mannix Letter) (describing relief given to Army and Air Force personnel in the USUHS class of 1987 as selectively favoring those who had attended the service academies). Further, the record does not show that the BCNR has thus far awarded CSC to any Navy personnel in that class. *See* Pl.'s Facts ¶ 11 (stating that "the BCNR has refused to grant relief to Plaintiff or other Navy personnel in his class"); AR at 2 (BCNR decision denying plaintiff relief, noting that a board need not blindly follow the decision of another board, and commenting that the Air Force board was "wrong in granting relief to any members of the Class of 1987 regardless of recruiter misinformation"). Within the USUHS class of 1987, the Army and Air Force personnel who were graduates of the service academies were apparently able to provide their boards with evidence of faulty guidance and counseling provided by specific staff members of those academies regarding CSC for years spent at USUHS. *See* AR at 42 (favorable ABCMR decision for an Army doctor noting that "[t]he applicant made a detrimental career decision based on erroneous information from the Acting Surgeon, [United States Military Academy (USMA)], and Chairman, Medical Program Advisory Committee"); *id.* at 52 (favorable ABCMR decision for an Army doctor noting that "the applicant was specifically mis-advised by the responsible counselors at USMA concerning the granting of longevity credit for pay purposes during time spent in USUHS"); *id.* at 56 (memorandum to ABCMR noting that the Air Force board had granted relief based on "[t]he only new evidence in [the applicant's] second request [which was] the documented evidence of miscounseling during her attendance at the Air Force Academy by LTC Cairney and MAJ Woods of the Health Professions Advisory Committee").

The pivotal factor deciding whether a particular Army or Air Force doctor in the class of 1987 received CSC from the appropriate board appears to be whether or not that officer could provide clear documentary evidence of specific misinformation and faulty counseling that he or she received as an undergraduate, and probable reliance on such information. *See* AR at 41 (ABCMR decision stating that "no reason exists to recommend relief without clear-cut evidence of improper counseling, and a reasonable belief that the individual still relied on such improper counseling years after the effective date of the law"). For at least one Army doctor, it appears that because Air Force doctors had already been granted CSC because of faulty career counseling they had received at the United States Air Force Academy (USAFA), the ABCMR was more inclined to consider his proof of

faulty counseling at USMA as adequate grounds for relief. *See* AR at 42 (ABCMR decision noting as support for its award of CSC that the Air Force board "has already granted relief to former USAFA Cadets who were similarly counseled and used such counseling as part of their decision process in enrolling in the USUHS Class of 1987"). The exact number of recipients of CSC among the class of 1987, or a breakdown of that number by branch of service or undergraduate school, is not in the record, but plaintiff estimates that approximately one-third of his classmates in the class of 1987 have received CSC. *Id.* at 18.

It is unclear when the passage of DOPMA in 1980 and the revocation of pre-DOPMA CSC benefits ceased to be a source of confusion for entering classes at USUHS. Mr. Charles Mannix, USUHS General Counsel, wrote that a "clear dividing line' exists. AR at 88. "Students in the USUHS Class of 1988 and thereafter were sent documentation specifically informing them that they would no longer be eligible for pre-DOPMA benefits." *Id.* The record before the court, however, contains some allegations that the AFBCMR also gave CSC credit to some members of the USUHS class of 1988.[2] *See id.* at 19, 57. The court need not address this issue further, however, because all of plaintiff's arguments rest on the CSC relief granted to or denied to members of the USUHS classes of 1986 and 1987.

### A. The BCNR Properly Considered Plaintiff's Application for Relief

Although many formulations of the arbitrary and capricious standard of review exist, when the standard is applied to military pay cases in this circuit, the court is largely concerned with whether the correction board's decision is procedurally fair and supported by substantial evidence. *Heisig v. United States*, 719 F.2d 1153, 1156 & n.12 (Fed. Cir. 1983) (citation omitted). The correction board's decision must be sufficiently detailed for the court to ascertain the reasoning behind the denial of benefits to the applicant. *See Buchanan v. United States*, 621 F.2d 373, 383 (Ct. Cl. 1980) ("The burden that would be placed upon

[2]/ One distinction between the class of 1988 and the class of 1989 might be that the information regarding DOPMA's revocation of CSC benefits was sent to the class of 1989 earlier in the applicant's decision-making process. *See* AR at 83 (Letter of Dr. Jay P. Sanford, USUHS Medical School President/Dean) (noting that for the class of 1988 the mailing occurred prior to matriculation, but for the class of 1989 the mailing occurred at the time of initial conditional acceptance).

plaintiff in this court would be almost impossible if the correction board were permitted, in these circumstances, to cast aside the issues without discussion or reason and merely state that insufficient evidence has been presented to indicate probable injustice or material error."); *Craft v. United States*, 544 F.2d 468, 474 (Ct. Cl. 1976) (noting that "[t]he reasons [for the denial] need not be expressed in great detail . . . [;] [a]ll that is required is sufficient notification to the serviceman to permit him, if he may, to rebut the board's action" (citing *Harris v. United States*, 177 Ct. Cl. 538, 545-46 (1966) and *Imhoff v. United States*, 177 Ct. Cl. 1, 8 (1966))). In particular, the denial must discuss the applicant's stated grounds for correction of his records and the essential facts relevant to those arguments. *See* 32 C.F.R. § 723.3(e)(4) (2003) ("The brief statement of the grounds for denial shall include the reasons for the determination that relief should not be granted, including the applicant's claims of constitutional, statutory and/or regulatory violations that were rejected, together with all the essential facts upon which the denial is based . . . ."). The court must also consider whether the correction board has failed to correct "plain legal error." *Dodson v. United States Gov't, Dep't of Army*, 988 F.2d 1199, 1204 (Fed. Cir. 1993) (citations omitted).

The court accords a presumption of regularity and deference to a correction board's denial of relief. *Id.* (noting that "military administrators are presumed to act lawfully and in good faith like other public officers, and the military is entitled to substantial deference in the governance of its affairs" (citing *Arens v. United States*, 969 F.2d 1034, 1037 (Fed. Cir. 1992))). However, "'when a correction board fails to correct an injustice clearly presented in the record before it, it is acting in violation of its mandate.'" *Roth v. United States*, 378 F.3d 1371, 1381 (Fed. Cir. 2004) (quoting *Yee v. United States*, 512 F.2d 1383, 1387 (Ct. Cl. 1975)); *see also* 32 C.F.R. § 723.2(b) (2003) ("[The board's] function is to consider applications properly before it for the purpose of determining the existence of error or injustice in the naval records of current and former members of the Navy and Marine Corps, to make recommendations to the Secretary or to take corrective action on the Secretary's behalf when authorized."). In cases of clear injustice, the board has a moral duty to "'take steps to grant thorough and fitting relief.'" *Roth*, 378 F.3d at 1381 (quoting *Caddington v. United States*, 178 F. Supp. 604, 607 (Ct. Cl. 1959)). When a board does not act to redress clear injustice, its decision is arbitrary and capricious and must be overturned upon review by this court. *See Yee*, 512 F.2d at 1387 (citing *Skaradowski v. United States*, 471 F.2d 627 (Ct. Cl. 1973) and *Duhon v. United States*, 461 F.2d 1278 (Ct.

Cl. 1972)).

Applying this standard to the pending cross-motions in the subject matter, as it must, the court notes that plaintiff here has not alleged any procedural flaws in the decision-making of the BCNR culminating in its denial of CSC for Dr. Boyer's four years at USUHS. Thus, the questions before the court are: (1) whether the BCNR decision was supported by substantial evidence; (2) whether the board's reasoning was sufficiently detailed in the denial sent to plaintiff on February 12, 2004; and (3) whether the BCNR failed to redress a clear injustice. The only legal error alleged is a constitutional violation, which will be addressed separately, *infra*.

### 1. The BCNR Decision Was Neither Arbitrary Nor Capricious

The court reproduces here, in relevant part, the reasons given by the BCNR for its denial of CSC to Dr. Boyer for his years at USUHS:

> The Defense Officer Personnel Management Act which became effective on 15 September 1981, expressly precludes granting constructive service credit for pay purposes. Consequently, absent special circumstances that give rise to a clear injustice it would be contrary to both the spirit and express letter of the law to grant requests for constructive service credit for pay purposes. After carefully reviewing the facts of your case and the arguments offered by counsel the Board concluded that the circumstances of your case fail to show that you have suffered an injustice.
>
> With regard to your assertion that you received erroneous advi[c]e as to constructive service credit, the Board is not persuaded that the alleged miscounseling was a pivotal factor in your decision to accept a scholarship. The fact that the Board granted relief to the Uniformed Services University of Health Sciences (USUHS) students in the Class of 1986 and those students accepting a scholarship in the Armed Forces

> Health Professions Scholarship Program who graduated from medical school in 1986 does not, in and of itself, provide the Board with an adequate basis for granting you constructive service credit. This is due to the unique circumstances of those petitions which show[] that they were recruited during the early 1982 time frame and commenced school in 1982. You, on the other hand, did not start medical school until August 1983. The Air Force and Army correction boards had previously granted relief to Air Force and Army personnel in the USUHS Class of 1986, and to not do the same for the Navy personnel would have resulted in a clear inequity. The Army board also granted relief to scholarship students who graduated in 1986.
>
> Your most recent submission showed that the Air Force Correction Board (AFBCMR) has in fact granted relief to several Air Force members of the USUHS Class of 1987. The first AFBCMR action of this nature was apparently taken on 14 September 1990, without coordination with either this Board or the Army, as was encouraged by the Assistant Secretary of Defense (ASD) in his memo of June 28, 1990. In any event the law is clear that the actions taken by one service correction board need not be blindly replicated by the other boards. It is this Board's position that the AFBCMR was wrong in granting blanket relief to the Class of 1986, and that it was also wrong in granting relief to any members of the Class of 1987 regardless of recruiter misinformation. Such action has created serious inequities within the Air Force USUHS Class of 1987 graduates as well as the Army and Navy graduates of the USUHS Class of 1987.
>
> Accordingly, your application has been denied.

AR at 1-2. The BCNR asserted that "the evidence submitted was insufficient to establish the existence of probable material error or injustice." *Id.* at 1. The board,

in reviewing the record for "special circumstances" and "clear injustice," found none. *Id.* Although reasonable minds could differ on this point, the court nonetheless finds that there was substantial evidence to support the board's denial of CSC for a person in Dr. Boyer's circumstances, based upon the record before the BCNR.

### a. DOPMA Changes the Law

As discussed in some detail *supra*, DOPMA had removed any statutory right to CSC for the members of the USUHS class of 1987. The board relied principally on the decision of Congress to change the law to the disadvantage of students like Dr. Boyer. Thus, the first and most damaging piece of evidence in the record was that Dr. Boyer entered USUHS two years too late to benefit from CSC that was available pre-DOPMA. In the absence of statutory permission to expend funds arising from CSC on the members of the class of 1987, the board was required to limit relief to those individuals who could demonstrate a clear injustice militating against the clear and unmistakable application of the law.

Second, the BCNR noted that Dr. Boyer, in comparison to those in the USUHS class of 1986 who eventually received relief from the board, had started school a year later and thus was subject to different circumstances. AR at 1. The passage of time is not insignificant – DOPMA was enacted on December 12, 1980, Pub. L. No. 96-513, § 402, 94 Stat. 2835, 2904 (1980), and Dr. Boyer received his invitation to attend USUHS on or about March 29, 1983, over two years later. AR at 62. Even considering the effective date of DOPMA, September 15, 1981, Dr. Boyer had over a year and a half within which to learn of the change in benefits available to doctors choosing to get their medical training through the military. Those dealing with the government are charged with knowing the law that governs those relations. *See Montilla v. United States*, 457 F.2d 978, 986 (Ct. Cl. 1972) (holding that a "plaintiff is charged with knowledge of [statutes passed by Congress]"). Although the BCNR did not point out the precise significance of the additional time that had passed between the passage of DOPMA and Dr. Boyer's matriculation at USUHS, it is clear that the board considered that additional time as relevant to the analysis of whether Dr. Boyer's circumstances were special or presented a clear injustice. The court agrees with the BCNR that an additional year does make a difference, especially when considering whether an individual enlisting in the armed services should have been aware of a change in the law, and

whether that individual reasonably relied on misinformation concerning the true state of the law. The passing of an additional year supports the board's conclusion that Dr. Boyer did not benefit from the "unique circumstances" affecting the class of 1986.

**b. Did Dr. Boyer Rely on Inaccurate Information?**

The third evidentiary issue considered by the board was the "erroneous advi[c]e" allegedly received by Dr. Boyer and the effect of any such "alleged miscounseling" on Dr. Boyer's decision to attend USUHS. AR at 1. To be clear, the board did not make a finding on this point, rather, the BCNR was "not persuaded that the alleged miscounseling was a pivotal factor in [Dr. Boyer's] decision to accept a scholarship." *Id.* In essence, the board's denial was based, in part, on plaintiff's failure of proof regarding his reliance on alleged misinformation regarding CSC.

When reviewing the board's conclusion that plaintiff's evidence was not persuasive as to Dr. Boyer's specific factual allegations of misinformation and reliance, the "unsupported by substantial evidence" portion of the arbitrary and capricious standard seems somewhat inapt. Requiring the board to necessarily have before it substantial evidence that Dr. Boyer received correct information regarding CSC, or that he did not rely on any misrepresentations by USUHS, would put the Navy in the untenable position of having to prove a negative: injustice occurred unless the Navy can unearth and place in the record evidence to the contrary. *See AINS, Inc. v. United States*, 365 F.3d 1333, 1344 (Fed. Cir. 2004) (noting that "it is always difficult to prove a negative").

Here, it was the board's role to review the record before it for sufficient evidence of "error or injustice." 32 C.F.R. § 723.2(b) (2003) ("[The board's] function is to consider applications properly before it for the purpose of determining the existence of error or injustice in the naval records of current and former members of the Navy and Marine Corps . . . ."); *see also Harris*, 177 Ct. Cl. at 544 (describing the BCNR's "statutory duty to determine whether sufficient evidence *has been presented* to indicate probable material error or injustice") (emphasis added). In cases where there is no legal right to a benefit, but possibly an equitable right to have an injustice corrected, the court believes that a correction board may reasonably place the burden of proof on the applicant to present such

evidence for the board's review.[3] When a board offers such an applicant a reasonable opportunity to meet this burden, the board's denial of benefits must be affirmed unless that denial of benefits is unreasonable. *See Haselrig*, 333 F.3d at 1357 (approving of the fact-finding actions taken by a correction board because the procedures followed "represent a reasonable means of determining whether an officer [should be given relief] . . . [and concluding that] the Correction Board did not act in a manner that was arbitrary, capricious, not supported by substantial evidence, or contrary to law").

On the questions of "miscounseling" and reliance on misinformation regarding CSC provided for time studying at USUHS, the BCNR had several types of evidence before it. For example, the record contained Dr. Boyer's affidavit in

---

[3]/ According to the precedent of this circuit, a correction board possesses a greater level of discretion when it is asked for equitable relief regarding a putative injustice, than when relief related to factual or legal error is requested:

> The Board is to recommend action to correct "error" or 'injustice', 10 U.S.C. § 1552. The two things are not the same. 'Error' means legal or factual error. Normally, it is such that a court of law could correct it whether the soldier or sailor had first applied to a Correction Board, or not. If the Board when asked, fails to correct such an "error", courts will correct it on judicial review. "Injustice", when not also 'error', is treatment by the military authorities, that shocks the sense of justice, but is not technically illegal. *Yee v. United States*, 206 Ct. Cl. 388, 512 F.2d 1383 (1975). Soldiers and sailors cannot apply directly to courts for correction of 'injustice' that is not 'error'. When they apply to Boards established under 10 U.S.C. § 1552, for correction of such "injustice", these Boards exercise high discretionary functions in the management of the military establishment. Courts are not authorized to intervene except in manifest cases of abuse of discretion, and perhaps not always effectively even then, because they may not have jurisdiction to fashion a satisfactory mode of relief in all cases.

*Reale v. United States*, 208 Ct. Cl. 1010, 1011-12 (1976). Because the granting of equitable relief by a correction board is highly discretionary, it would be illogical for this court to deny the board the right to assign a burden to the applicant, *i.e.*, that he must provide sufficient evidence to support his case for equitable relief.

which three statements address this issue:

> 3. I was never informed of any rule or regulation or law which would prevent me from earning pay and credits for my years at USUHS, and never learned of DOPMA 1981 modifications until after matriculating at USUHS.
> 4. Had I known of the DOPMA changes in time to accept entrance into another medical school, I would not have attended USUHS.
> 5. The 1983-1984 USUHS Bulletin was made available to me prior to matriculation, and I relied on its presentations regarding pay, "Longevity credit for pay purpose[s] accrues for students for time spent in school" (USUHS 1983-1984 Bulletin, pg. 45).

AR at 95. Dr. Boyer's affidavit is dated March 21, 2003, approximately twenty years after he decided to attend USUHS. The administrative record in this case does not include any contemporaneous records which directly controvert his statements in 2003 that he was not informed of DOPMA changes to CSC; that he would have studied elsewhere had he known of the change in CSC policy; or that he relied on the errors in the 1983-1984 USUHS Bulletin. However, in his second application to the BCNR regarding CSC, in 1992, while Dr. Boyer describes in detail how he never received information regarding DOPMA before deciding to attend USUHS, he does not similarly describe his reliance on such misinformation as categorically determinative of his choice of medical school:

> Taking the Oath of Office in Spring 1983 as Ensign, USNR, was a prerequisite prior to matriculation at USUHS and admission to Officer Indoctrination School at Newport, RI. Because of this, I could not consider possible acceptance at affordable California medical schools where my application was still in serious consideration. Had I known about the effects of DOPMA my ultimate decision in committing to military service as opposed to a civilian medical school may have

> been different.

AR at 100.

As to the general phenomenon of misinformation about CSC and reliance on that misinformation by some members of the USUHS class of 1987, the record includes letters or memoranda from officials at USUHS, and the records of proceedings before the ABCMR and the AFBCMR, wherein specific instances of inaccurate counseling were alleged. The letters from staff at USUHS, discussed in more detail below, suggest that some, but not all, members of the class of 1987 relied on misinformation and inaccurate counseling in making their decision to attend USUHS. The court reviews the documents provided by USUHS here, and reserves its discussion of other board decisions granting relief to members of the class of 1987 for Section IV(A)(2)-(3) of this opinion, *infra*.

The letters from USUHS officials, when taken together, can fairly be read to assert that some, but not all, members of the class of 1987 were not informed of DOPMA. There are three memoranda from LTC (Ret.) Peter J. Stavish, the Director of Admissions, written before the class of 1987 had graduated. The last of which, dated April 18, 1985, states in relevant part:

> [A]ll interested matriculants who were interviewed for the Class of 1987 and subsequent classes, were verbally informed that the information contained in the USUHS Bulletin, 1983-1984 regarding [CSC] was in fact no longer true due to the recent DOPMA legislation.
>
> It cannot be said that every interviewee was told the exact information on each interview day. On three occasions I did not personally give the briefing . . . . It is very possible that a given segment of the Class of 1987 could have, and probably did, receive inaccurate or incomplete information from any number of official/semi-official sources concerning the effects upon [CSC] due to the DOPMA legislation.

AR at 58. Two earlier versions of this memorandum, dated February 12, 1985,

vary slightly in tone as to how many applicants in the class of 1987 received news of DOPMA changes to CSC: one version stated that "it is possible that a handful of applicants did not get the word about the new legislation" and the other noted that "[i]t cannot be said that all persons who were interviewed understood or paid attention to what was being said; however, the Office of Admissions went to extreme length[s] to verbally inform all interviewees of the new legislation." AR at 65-66. Thus, according to LTC Stavish, some members of the Class of 1987 were told of the changes to CSC brought about by DOPMA.

The President/Dean of the medical school at USUHS, Dr. Jay P. Sanford, wrote two memoranda regarding the CSC issue for the AFBCMR in 1985-86, again before the class of 1987 had graduated. The first memorandum was written on December 26, 1985 because "an apparent misunderstanding regarding this service credit has resulted in a number of petitions for records correction . . . by members of the Class of 1987." AR at 106. Dr. Sanford noted the error in the 1983-1984 USUHS Bulletin, but stated that news of DOPMA "was to be included in a broad one-hour briefing on the application process, the academic program and careers in military medicine," and attached a briefing outline which included this topic. *Id.* Dr. Sanford admitted that "it is apparent that some members of the Class of 1987 did not receive the information regarding the changes in [CSC]" for a variety of reasons, and that they probably heard inaccurate statements about CSC from USUHS students and active duty medical officers. *Id.* at 106-07. Dr. Sanford concluded that "a percentage of members of the Class of 1987 were either not or were inaccurately informed of the impact of the DOPMA on basic pay and retirement pay." *Id.* at 107.

In a follow-up memorandum dated December 11, 1986, Dr. Sanford further clarified the extent of misinformation that was given to applicants in late 1982 and early 1983. AR at 108. He had met with some members of the class of 1987 and was "now convinced that even at some of the briefings presented by [LTC Stavish] that specific details regarding [CSC] were not included or that a change in this aspect of DOPMA was implied." *Id.* He reiterated his conclusion "that a proportion of members of the Class of 1987 were either not or were inaccurately informed of the impact of the DOPMA on basic pay and retirement pay." *Id.*

Mr. Charles R. Mannix, USUHS General Counsel, wrote a letter to an official at the Pentagon who had inquired into the issue of CSC for the class of

1987. AR at 87-88. This exchange occurred in 1998, approximately fifteen years after the events in question, and was apparently related to a meeting the Pentagon official had or would have with members of Congress to discuss the issue of "final closure of CSC for the 1987 Class." *Id.* at 88. There had been some Congressional attention to this issue at about this time. *See id.* at 88, 90, 92. Mr. Mannix summarized the facts concerning the misinformation about CSC and the class of 1987:

> Regarding miscounseling of the USUHS Class of 1987, it appears that information available in the public domain, as well as the admissions interview information with regard to DOPMA credits were not correct. The information contained in the USUHS bulletin and obtained during the admissions interview incorrectly led interviewees to conclude that they would get pre-DOPMA benefits. Our own interviewers used the information contained in the bulletin as the basis for counseling applicants . . . . Furthermore, during this era there was not a clear understanding of the ramifications of the DOPMA legislation.

*Id.* at 87-88. Mr. Mannix concluded that "the University acknowledges responsibility for unintentional miscounseling." *Id.* at 88.

Thus, from the documents generated by USUHS staff, especially those generated during the years when the class of 1987 was still in school, three uncontroverted facts emerge. First, there was an error in the 1983-1984 USUHS Bulletin regarding CSC. Next, there was an effort to verbally correct this misinformation by the admissions staff. And, third, despite these efforts, some members of the class of 1987 remained uninformed or misinformed as to the effect of DOPMA on CSC for study at USUHS.[4]

---

[4]/ The record also includes affidavits from Dr. Boyer's classmates, who recount their own experiences receiving inaccurate information from USUHS regarding DOPMA. *See* AR at 69-71 (statement of Navy member of the class of 1987 who stated that he was briefed on post-DOPMA CSC changes related to retirement pay, albeit with some confusion about the changes being "'in flux,'" but not briefed on post-DOPMA CSC changes related to basic pay); *id.* at 75-
(continued...)

When reviewing the totality of the evidence concerning Dr. Boyer's circumstances when applying to USUHS, the court finds that the BCNR was reasonable in finding that Dr. Boyer had not met his burden of proof regarding reliance on misinformation related to CSC. Plaintiff alleged that he had no information about DOPMA, that he relied on the mistakes in the USUHS 1983-1984 Bulletin regarding CSC, and that he would not have attended USUHS but for that misinformation. AR at 95. The BCNR reviewed the record and was "not persuaded that the alleged miscounseling was a pivotal factor in [his] decision to accept a scholarship." *Id.* at 1. Although plaintiff now complains that the BCNR "improperly disregarded the sworn statements of Plaintiff, a respected physician and former Navy Commander," Pl.'s Mot. at 7, the statements of Dr. Boyer are not entirely consistent over time.[5] *Compare* AR at 95 ("Had I known of the DOPMA changes in time to accept entrance into another medical school, I would not have attended USUHS.") with *id.* at 100 ("Had I known about the effects of DOPMA my ultimate decision in committing to military service as opposed to a civilian medical school may have been different."). Upon this record, there is room for reasonable doubt as to whether Dr. Boyer relied on a promise of CSC as the "pivotal factor" in his choice of a medical education. *Id.* at 1. As the ABCMR stated in the case of another member of the class of 1987, "no reason exists to recommend relief without clear-cut evidence of improper counseling, and a reasonable belief that the individual still relied on such improper counseling years after the effective date of the law." *Id.* at 41.

---

[4](...continued)
76 (statement of Navy member of the class of 1987 who stated he was briefed on post-DOPMA CSC changes related to retirement pay, but not briefed on post-DOPMA CSC changes related to basic pay).

[5]/ Plaintiff's citation to *Van Cleave v. United States*, 70 Fed. Cl. 674 (2006) is unavailing. The court does not read *Van Cleave* as creating a standard of review for credibility decisions made by a board for correction of military records. *See id.* at 684 (describing a credibility determination by the BCNR as "*per se* arbitrary and capricious"). Rather, the court views the discussion in *Van Cleave* as an assessment of the circumstances of that case, which involved a remand to the BCNR by this court, and, as such, its holding is limited to the facts presented therein. *See id.* at 679 n.6 (noting that "[t]he reasons the BCNR gave for its claim that Mr. Van Cleave was not credible ranged from the petty to the absurd"). The subject matter is clearly distinguishable, because the court finds nothing petty or absurd in the decision challenged here. Moreover, even if *Van Cleave* had articulated a new standard of review applicable to fact-finding by a military board, *Van Cleave* is not binding precedent on this court.

**c. The BCNR Decision Was Supported by Substantial Evidence and Was Reasonable**

There was substantial evidence that DOPMA denied plaintiff and all other members of the class of 1987 a statutory right to CSC for their years of training at USUHS. There was also substantial evidence that the class of 1987 had even less of an equitable right to CSC than the class of 1986, because the passage of time made reliance on ignorance of the law even less reasonable. Finally, the BCNR placed a reasonable burden of proof on plaintiff to show that he relied on ignorance of DOPMA in his choice of medical school, and the board reasonably determined that the record before it did not include evidence that met that burden of proof. For these reasons, the BCNR decision challenged in this lawsuit was not "arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *Chambers*, 417 F.3d at 1227 (citation omitted).

**2. The BCNR Decision Sent to Plaintiff on February 12, 2004 Was Sufficiently Detailed**

Plaintiff makes two arguments regarding the alleged arbitrariness of the BCNR decision which may be roughly grouped together, because both arguments assert that the February 12, 2004 decision reflects inadequate consideration of Dr. Boyer's application before the board. Plaintiff argues that the BCNR ignored a non-frivolous argument in its denial of Dr. Boyer's application. Plaintiff also argues that the BCNR did not base its denial on Dr. Boyer's individual circumstances. The court will address each argument in turn.

**a. Omitting Mention of the ABCMR's Grant of Relief to Certain Army Members of the Class of 1987**

When Dr. Boyer appealed to the BCNR in 2003, after his previous applications had been rejected, he was able to present new evidence that not only the Air Force, but the Army, as well, had granted CSC to members of the USUHS class of 1987. AR at 11-12, 16. The BCNR, in its denial of plaintiff's application, only mentions the Air Force board and the relief it granted to certain members of the class of 1987, and does not mention the Army board's actions. *Id.* at 2. For the following reasons, the court does not consider this omission to be material, or evidence of arbitrariness on the part of the BCNR.

The first denial Dr. Boyer received from the BCNR, dated July 10, 1990, made no mention of relief granted to members of the class of 1987 by other boards, because his application made no mention of such relief, quite possibly because the other boards had not yet granted relief to any members of the class of 1987. AR at 113-14. The second denial Dr. Boyer received from the BCNR, dated June 25, 1992, was similarly silent on the issue of relief granted by other boards to members of the class of 1987, apparently for the same reasons. *Id.* at 96. Another denial dated July 9, 2003, even though information concerning the actions of other boards was now included in Dr. Boyer's application, stated that the new information was "not material" and that "the decision would inevitably be the same." *Id.* at 6. Finally, when plaintiff's counsel ably requested the reasons for the latest denial, the board responded with the denial at issue in this litigation. *Id.* at 1-2. The February 12, 2004 denial does discuss the actions of another board, but only refers to one board, not two. This is not altogether surprising, given the composition of the letter of appeal, dated May 7, 2003, and the supporting documents attached to his application for reconsideration, which was dated May 1, 2003.

Plaintiff now complains that "the BCNR failed to address Plaintiff's new evidence and key argument that not only the AFBCMR, but also the ABCMR, had granted relief to members of his class." Pl.'s Mot. at 6. A brief description of his 2003 application for reconsideration packet is useful in the analysis of whether a "key argument" was ignored by the BCNR. Dr. Boyer's application to the board consisted of approximately eighty-eight pages. AR at 8-95. The letter of appeal drafted by his counsel at the time, which summarized the evidence in the packet, itself numbered nine pages. *Id.* at 10-18. The court has searched this letter in vain for any prominent mention of the allegedly "key argument" that the BCNR must now grant relief because two boards, namely the AFBCMR and the ABCMR, have granted relief to some of their applicants.

Instead, the letter of appeal begins, in a section titled "Summary," with a series of bulleted "new information" items, none of which indicate that two boards have now granted relief to members of the USUHS class of 1987. AR at 10-11. The only board action mentioned by name is that of the Army board. *Id.* at 11. The next section of the appeal letter, titled "New Information," describes in some detail the relief granted to three members of the class of 1987 by the Army board. *Id.* at 11-12. The letter of appeal returns to a discussion of evidence before a board a few paragraphs later, but again only gives detail regarding the recent actions

taken by the Army board. *See* AR at 14-15. The only documents from appeals before other boards attached to Dr. Boyer's letter of appeal are from appeals to the ABCMR. *See* AR at 23-42, 48-60. The letter of appeal submitted by Dr. Boyer to the BCNR could arguably be read, based on the summary section, several descriptive paragraphs and a large number of pages of supporting documents referenced therein, to present the key argument that one board, the ABCMR, had now begun to grant relief to some members of the USUHS class of 1987, and, therefore, the BCNR should do the same. If this is indeed the key argument presented in Dr. Boyer's appeal, the BCNR decision, as discussed *infra*, referring to the action of one board, the AFBCMR, must be reviewed for its consideration of this argument.

Dr. Boyer's letter of appeal does, in addition, contain some references to the AFBCMR, and to the fact that two boards have now granted relief to some members of the class of 1987. There is a list of AFBCMR cases that plaintiff believes resulted in the granting of CSC. AR at 19. When describing the letter by Mr. Mannix, USUHS General Counsel, referenced *supra* in this opinion, the letter of appeal makes mention of actions by the AFBCMR and the ABCMR: "Mr. Mannix noted actions taken by the Boards for Correction of Air Force and Army Records . . . ." *Id.* at 12. This is followed by the another reference to both the Air Force and the Army boards when discussing a letter from an official at the Pentagon: "[The official] wrote to the Secretaries of the Army, Navy and the Air Force, informing the Boards to act cooperatively and to assure that there was a consistent, uniform response to awarding [CSC] . . . [;] [i]t appears that the Army Board and the Air Force Board have heeded this directive . . . ." *Id.* at 13. In a section titled "Need for Consistency," the letter of appeal mentions both the AFBCMR and the ABCMR and summarizes the significance of the relief granted by the two boards:

> The Air Force's Board's decisions to grant relief influenced those of the Army Board: The Navy Board's decisions regarding Dr. Boyer should follow suit, honoring the dictates to correct errors and injustice, and to render consistent, fair, equitable and just treatment.

*Id.* at 16. Thus, although it may not be plaintiff's key argument, necessarily, the letter of appeal also asks the BCNR to consider granting relief consistent with that

granted by the AFBCMR and the ABCMR.

Accordingly, the court must decide whether the BCNR responded sufficiently to these two arguments presented by plaintiff: (1) the evidence before the ABCMR, and the granting of relief by the ABCMR, are persuasive reasons to reconsider the denial of CSC to Dr. Boyer; and, (2) the BCNR should grant relief consistent with that granted by the AFBCMR and the ABCMR. The relevant portion of the BCNR decision states that:

> Your most recent submission showed that the Air Force Correction Board (AFBCMR) has in fact granted relief to several Air Force members of the USUHS Class of 1987. The first AFBCMR action of this nature was apparently taken on 14 September 1990, without coordination with either this Board or the Army, as was encouraged by the Assistant Secretary of Defense (ASD) in his memo of June 28, 1990. In any event the law is clear that the actions taken by one service correction board need not be blindly replicated by the other boards. It is this Board's position that the AFBCMR was wrong in granting blanket relief to the Class of 1986, and that it was also wrong in granting relief to any members of the Class of 1987 regardless of recruiter misinformation. Such action has created serious inequities within the Air Force USUHS Class of 1987 graduates as well as the Army and Navy graduates of the USUHS Class of 1987.

AR at 2. Obviously, the decision omits any mention of actions of the ABCMR granting relief to the class of 1987, and does not acknowledge that two boards, not just one, have granted relief to members of Dr. Boyer's class at USUHS. Nonetheless, the court believes that such omissions are immaterial, because the BCNR decision is responsive to the evidence and both of plaintiff's arguments related to other board decisions.

First, the BCNR notes that "the law is clear that the actions taken by one service correction board need not be blindly replicated by the other boards." AR at 2. A logical corollary of this argument is that, in addition, a board need not blindly

follow the actions of two boards. Thus, the board's statement responds to both of plaintiff's arguments, and indeed appears to be a correct statement of the law. Second, the BCNR notes that no coordination between the boards was attempted by the AFBCMR before issuing its decision unilaterally granting CSC to one member of the class of 1987 in 1990, which, in the end, places part of the blame for lack of consistency on the AFBCMR, not on the BCNR. Third, the board notes that there are now inequities among Air Force members of the USUHS class of 1987, for not all of them received CSC, and that such inequities are replicated throughout the cohort of Air Force, Army and Navy members of the class of 1987.

Although the BCNR does not go into detail as to why it would not follow the AFBCMR and grant relief in this instance, the board has given adequate legal reasons to permit Dr. Boyer to challenge the denial in this court. Earlier in the decision, the BCNR concluded that Dr. Boyer had no legal right to CSC because of the passage of DOPMA, and that the evidence in the record was not persuasive as to his reliance on misinformation regarding CSC for years spent studying at USUHS. Here, the BCNR gave its reasons for not following the lead of the AFBCMR in granting relief to some, but not all, of its personnel in the class of 1987. This is all the standard requires of a decision from a board for correction of military records.[6] *See Craft*, 544 F.2d at 474 (noting that "[t]he reasons [for the denial] need not be expressed in great detail . . . [;] [a]ll that is required is sufficient notification to the serviceman to permit him, if he may, to rebut the board's action") (citations omitted). It is immaterial that the board omitted a statement noting that, for the same reasons, it need not blindly follow the ABCMR, as well as the AFBCMR, a statement which would have been, in all relevant respects,

---

[6]/ Plaintiff cites numerous nonprecedential cases in its opening brief, in support of his allegation that a higher level of detail is required in the decisions of a board for correction of military records than is present in this case. *See* Pl.'s Mot. at 5-6. In his reply brief, plaintiff cites to precedential cases for the same proposition, although the court believes these cases merely reflect the "substantial evidence" standard of review, which has already been discussed and applied in this opinion, *supra*. *See* Pl.'s Reply at 3-4 (citing *Heisig*, 719 F.2d at 1157, *Istivan v. United States*, 689 F.2d 1034, 1038-39 (Ct. Cl. 1982), and *Williams v. United States*, 127 F. Supp. 617, 619 (Ct. Cl. 1955)). The court disagrees with plaintiff's interpretation of these decisions. The deferential review of board decisions by this court, established by long-standing precedent, permits some latitude in the level of detail a board must include when giving its reasons for denying an appeal. *Craft*, 544 F.2d at 474. Here, the reasoning of the BCNR is clear, and plaintiff was adequately informed of the evidentiary and legal underpinnings of the denial of his claims by the board.

redundant.

**b. Very Limited Discussion of Plaintiff's Individual Circumstances**

Plaintiff, relying on no legal authority, suggests that the BCNR decision was arbitrary because "[t]he BCNR did not evaluate Plaintiff's individual circumstances and weigh the evidence that Plaintiff presented." Pl.'s Mot. at 7. The court finds no reason to replace the substantial evidence standard of review with an innovative "individual circumstances" standard created by plaintiff. As discussed *supra*, the BCNR relied on substantial evidence and was reasonable in deciding that equitable relief should be denied Dr. Boyer. For this reason, the court will not overturn the denial challenged here simply because the BCNR did not include a recitation of all of the facts alleged by plaintiff in support of his application for relief. All that is required is a discussion of the essential facts of his case. *See* 32 C.F.R. § 723.3(e)(4) (2003) ("The brief statement of the grounds for denial shall include the reasons for the determination that relief should not be granted, including the applicant's claims of constitutional, statutory and/or regulatory violations that were rejected, together with all the essential facts upon which the denial is based . . . ."). Here, the essential facts were the passage of DOPMA, the passage of another year after the matriculation of the class of 1986, and the facts of Dr. Boyer's alleged reliance on misinformation concerning CSC – all of which were discussed in the BCNR decision. Plaintiff has not shown that the BCNR decision was arbitrary or capricious or unsupported by substantial evidence.[7]

---

[7]/ Plaintiff alleges that "the BCNR determined that relief should be denied to any member of the Class of 1987, regardless of any evidence of recruiter miscounseling or misinformation presented in an individual case." Pl.'s Reply at 6-7. This allegation is unproven, and is inapposite to the court's arbitrary and capricious review even if true. A more salient issue than misinformation is reliance, and the record is absolutely silent as to whether the BCNR, faced with clear evidence of detrimental reliance, would adhere to a *per se* practice of denying relief to any member of the USUHS class of 1987. Further, because the board's discretion is very high where injustice, rather than legal error is alleged, the court is not certain whether it could overturn the BCNR decision as arbitrary, if faced with proof of the board's categorical denial, regardless of misinformation and reliance, of all requests for relief from members of the class of 1987. *See Reale v. United States*, 208 Ct. Cl. 1010, 1011-12 (1976) and *supra* note 3. The issue of an alleged categorical denial of relief to the class of 1987 is revisited in the court's

(continued...)

### 3. There is No Injustice Clearly Presented in the Record Before the BCNR

Although precedential authority clearly states that a board for correction of military records must "'correct an injustice clearly presented in the record before it,'" *Roth*, 378 F.3d at 1381 (quoting *Yee*, 512 F.2d at 1387), the court is not aware of a precise definition of "injustice" that should be applied in such cases. Fortunately, the court is only concerned with this particular set of facts, and need not opine in more general terms on the subject. Plaintiff has pointed to a specific "injustice" allegedly presented in the record of this case, however the court has no difficulty in determining that this alleged instance of injustice is nothing of the sort.

Plaintiff asserts that the same type of inequity that the BCNR remedied for the members of the USUHS class of 1986, *i.e.*, two correction boards granting relief and a third not yet having done so, persists in the class of 1987. Pl.'s Mot. at 6. Because the Navy remedied such an inequity for the class of 1986, it would be unjust, plaintiff argues, to not remedy the same inequity present within the ranks of the class of 1987. *Id.* According to plaintiff, any decision to ignore that second injustice, after correcting the first, would be arbitrary and capricious. *Id.* at 6-7.

Plaintiff's argument, although of superficial attractiveness, ignores the differences between the relief accorded to the class of 1986 and the relief accorded to the class of 1987 by the military boards. For the class of 1986, it appears that first the AFBCMR, then the ABCMR, and then the BCNR, granted blanket relief to all applicants, regardless of individual circumstances. The Navy's decision to award blanket relief to the class of 1986 was, according to one document in the record, prompted by the "interest[s] of equity, justice, morale and retention." *See* AR at 87 (Letter of Mr. Charles R. Mannix, USUHS General Counsel, dated September 29, 1998). The BCNR, in its denial of Dr. Boyer's application, noted only that, had it not granted relief to the class of 1986, its refusal "would have resulted in a clear inequity." *Id.* at 2.

The BCNR was faced with a different set of circumstances affecting the

---

[7](...continued)
discussion of plaintiff's equal protection claims, *infra*.

class of 1987. The record before it showed that some portions of Army and Air Force members of the class of 1987 were being granted relief, particularly those who had attended service academies and who had letters from staff members of those academies acknowledging misinformation about CSC in the career counseling process. *See, e.g.*, AR at 19, 57, 60, 87. The BCNR noted that the AFBCMR had created inequities within the Air Force members of the class of 1987 by selectively granting CSC. *Id.* at 2. Within the records of other board proceedings submitted by Dr. Boyer to the BCNR, there are clear indications that the other boards were granting relief only when a particular level of proof of faulty career counseling was included in the request for relief. *See id.* at 41, 52. Because there are substantial differences between the blanket relief afforded the class of 1986, and the selective relief from the Army and Air Force boards granted to members of the class of 1987 based on new evidence from the service academies, the BCNR did not face the same inequity problem in its class of 1987 applications as it did in the class of 1986 applications. For this reason, the court sees no inherent injustice in treating applicants from the class of 1987 differently than those from the class of 1986, because the two cohorts of Navy personnel were not similarly situated. The BCNR decision is not arbitrary or capricious because of any failure to remedy an injustice clearly presented in the record.[8]

### B. No Violation of the Due Process Clause of the Fifth Amendment

#### 1. Rational Basis Review

Plaintiff invokes the equal protection component of the Due Process Clause of the Fifth Amendment and argues that denying him CSC for his years at USUHS, while awarding CSC to other members of the class of 1987 and to all members of the class of 1986, is unconstitutional. Plaintiff identifies the standard of review for the constitutionality of the BCNR decision to be whether "such disparate treatment bears [any] rational relationship to any legitimate governmental purpose." Pl.'s Mot. at 9. Defendant agrees that "rational basis review" is the required standard of review. Def.'s Mot. at 10. The parties appear to disagree, however, as to whether a rational basis review of back pay decisions made by the military is especially

---

[8]/ In a related inquiry, as to potential equal protection violations in the denial of plaintiff's application for relief, the court addresses the rational basis of the BCNR's different treatment of applicants from the classes of 1986 and 1987, *infra*.

deferential. *Compare* Def.'s Mot. at 10 ("Rational basis review of military matters is especially deferential." (citing *Loomis v. United States*, 68 Fed. Cl. 503, 520 (2005))) *with* Pl.'s Reply at 8 ("[I]n determining the proper deference due in the case at bar, it is important to recall that the issue here 'is not the composition of the military, but the society's legal obligation to those who are no longer within the military forces.'" (quoting *Fisher v. United States*, 402 F.3d 1167, 1182 (Fed. Cir. 2005))).

It does appear that in many military matters, deference colors rational basis review, although how this deference changes the analysis is not perfectly clear. *See Rostker v. Goldberg*, 453 U.S. 57, 66-72 (1981) (noting "[t]he operation of a healthy deference to legislative and executive judgments in the area of military affairs" but declining, in that decision, to adopt a new formulation of traditional levels of scrutiny that would apply only to equal protection claims in the military context); *Woodward v. United States*, 871 F.2d 1068, 1076-77 (Fed. Cir. 1989) (holding that "the Navy's policy on homosexuality is rationally related to a permissible end" and then adding that "[s]pecial deference must be given by a court to the military when adjudicating matters involving their decisions on discipline, morale, composition and the like") (citations omitted); *Loomis*, 68 Fed. Cl. at 521-22 (stating that the Army's "Don't Ask, Don't Tell" policy survives rational basis review and then noting that the court "owe[s] Congress a great deal of deference in matters concerning the military"); *Burns v. United States*, 9 Cl. Ct. 273, 277-78 (1985) (noting both that rational basis review and deference in military matters applied to policies regarding retention of Army officers, and concluding that the retention policy did have a rational basis) (citations omitted). Plaintiff's citation to *Fisher* is inapposite, because the Federal Circuit in *Fisher* was not asked to decide whether a rational basis review, or an especially deferential rational basis review, was required to decide the constitutionality of the military decision being challenged in that litigation. *See* 402 F.3d at 1183-84 (discussing, instead, whether the arbitrary and capricious standard of review applies to an Air Force decision denying disability retirement pay). The court finds it unnecessary to decide whether additional deference is due to the Navy in this instance, because the BCNR decision challenged here passes a rational basis review even in the absence of additional deference.

The "equal protection component of the Due Process Clause of the Fifth Amendment" does indeed protect federal employees from unconstitutionally

disparate treatment. *Briggs v. Merit Sys. Prot. Bd.*, 331 F.3d 1307, 1317 (Fed. Cir. 2003) (citations omitted). Unless the distinction in treatment "is drawn along suspect or quasi-suspect lines, such as race, or . . . impinges upon a fundamental right," a rational basis review is applicable. *Id.* (citations omitted). The Federal Circuit has succinctly described how a rational basis review is applied:

> On a rational basis review, a classification bears a strong presumption of validity, and the burden of persuasion is on a challenger to show the absence of a rational basis. [*Fed. Commc'ns Comm'n v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)]. A rational basis is "any reasonably conceivable state of facts" that support the classification. *Id.* Such facts may be based on "rational speculation unsupported by evidence or empirical data." *Id.*

*Briggs*, 331 F.3d at 1318. The "classification" at issue here, or more descriptively, the disparate treatment at issue here, is the denial of CSC to Dr. Boyer and the granting of CSC to the class of 1986 and certain members of the class of 1987 at USUHS.

As courts have noted, rational basis review is relatively lenient. *See, e.g.*, *Rui One Corp. v. City of Berkeley*, 371 F.3d 1137, 1156 (9th Cir. 2004) (stating that "the rational-basis inquiry is a very lenient one"); *Rothe Dev. Corp. v. U.S. Dep't of Def.*, 262 F.3d 1306, 1324 n.17 (Fed. Cir. 2001) (describing rational basis scrutiny as "more lenient"); *Haves v. City of Miami*, 52 F.3d 918, 923 (11th Cir. 1995) (referring to the "leniency of rational-basis scrutiny") (citation omitted); *Vietnam Veterans of Am. v. Sec'y of Navy*, 741 F. Supp. 1, 4 (D.D.C. 1990) (stating that "[t]he rational basis test of equal protection analysis is a very lenient one"). It is important to note that equal protection challenges to differences in treatment accorded to members of different branches of the armed services have been rejected by the courts because each branch of the service may fulfill its distinct mission using its own policies and procedures. *See Flute v. United States*, 535 F.2d 624, 629 (Ct. Cl. 1976) (finding no violation of equal protection where the different branches of the armed services offer varying levels of procedural rights); *Vietnam Veterans*, 741 F. Supp. at 5 ("Each branch is entitled to manage its internal operations as it sees fit without subjecting itself to an equal protection suit

simply because another branch has adopted a different approach in the management or discipline of its personnel.") (citing cases); *see also Oppermann v. United States*, No. 06-1824(EGS), 2007 WL 1748920, at *8 (D.D.C. June 15, 2007) (holding that "the inter-service disparity" in the terms of service of military judges did not violate the equal protection guarantee of the Due Process Clause of the Fifth Amendment). Here, the court must decide whether the BCNR had any rational basis for distinguishing between Dr. Boyer and the Navy personnel in the class of 1986, and for distinguishing between Dr. Boyer and the Air Force and Army members of the class of 1987 who received CSC from the AFBCMR or the ABCMR.

#### 2. Different Results for the Navy Personnel in the USUHS Class of 1986 and the Class of 1987

Although the court has addressed the issue of treating the Navy personnel in the USUHS classes of 1986 and 1987 differently *supra*, and has found that this disparate treatment by the BCNR passes both the "substantial evidence" standard of review and the "clear injustice" standard of review, the court now turns to a rational basis review of the same issue. The court must determine whether the BCNR decision to deny blanket relief to Dr. Boyer's class, after having given blanket relief to the class of 1986, was a rational means of achieving a legitimate government purpose. *See Woodward*, 871 F.2d at 1077 (testing a Navy policy to determine whether it "serves legitimate state interests"). The board's decision is unassailable under this standard.

These are the reasons stated by the BCNR for not extending blanket relief to Dr. Boyer:

> The fact that the Board granted relief to the Uniformed Services University of Health Sciences (USUHS) students in the Class of 1986 and those students accepting a scholarship in the Armed Forces Health Professions Scholarship Program who graduated from medical school in 1986 does not, in and of itself, provide the Board with an adequate basis for granting you constructive service credit. This is due to the unique circumstances of those petitions which show[] that they

> were recruited during the early 1982 time frame and commenced school in 1982. You, on the other hand, did not start medical school until August 1983. The Air Force and Army correction boards had previously granted relief to Air Force and Army personnel in the USUHS Class of 1986, and to not do the same for the Navy personnel would have resulted in a clear inequity. The Army board also granted relief to scholarship students who graduated in 1986.

AR at 1-2. The court understands the board to have considered members of the class of 1986 to have experienced "unique circumstances" related to the recent passage of DOPMA, when they were choosing a medical school in 1982, which were different from the circumstances of Dr. Boyer in 1983. There were also specific equitable reasons to extend blanket relief to the class of 1986, because of actions by the AFBCMR and the ABCMR, which were not present, to the same degree, within the class of 1987. These are rational interpretations of the record before the BCNR. Thus, it was rational for the BCNR to treat the class of 1987 differently, when this class had circumstances less compelling than those of the class of 1986. Withholding CSC from the class of 1987 also served a legitimate state interest, of protecting the treasury from expenditures not mandated by Congress. Indeed, Congress had explicitly revoked CSC for the class of 1987 in 1981. For these reasons, the BCNR decision to treat the USUHS class of 1987 differently than the class of 1986 survives the court's rational basis review.

#### 3. Different Results for Dr. Boyer and Some Air Force and Army Personnel in the Class of 1987

As to Air Force and Army personnel at USUHS, plaintiff asserts that he was the victim of disparate treatment compared to "similarly situated individuals who were literally and figuratively in the same class" of 1987. Pl.'s Mot. at 9. Equal protection guarantees in the constitution, plaintiff argues, forbid such disparate treatment. *Id.* Plaintiff relies on *Nordlinger v. Hahn*, 505 U.S. 1 (1992), for its proposition that the constitution "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Id.* at 10 (citing *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)).

This argument fails for a variety of reasons, only one of which merits discussion here. Plaintiff has not shown that he was similarly situated to the persons who were granted CSC by the AFBCMR and the ABCMR, as a prerequisite to his equal protection claim. *See, e.g.*, *Rostker*, 453 U.S. at 79 ("The Constitution requires that Congress treat similarly situated persons similarly, not that it engage in gestures of superficial equality."); *Able v. United States*, 155 F.3d 628, 631 (2nd Cir. 1998) ("Of course, the government can treat persons differently if they are not 'similarly situated.'"); *Absher v. United States*, 805 F.2d 1025, 1026 (Fed. Cir. 1986) (noting the burden on plaintiffs asserting equal protection claims "to overcome the presumption of constitutionality by identifying a similarly situated group"). As discussed in some detail *supra*, the particularly persuasive proof before the other boards, *i.e.*, a letter from a service academy staff member or members acknowledging giving misinformation about CSC for years of study at USUHS, is not part of the proof presented by Dr. Boyer to the BCNR in support of his case. *See* AR at 41, 52, 57, 60. Because the BCNR did not have the same type of relevant proof before it, Dr. Boyer has not shown that he was similarly situated to those members of the USUHS class of 1987 who received CSC. For this reason, the BCNR decision to deny CSC to Dr. Boyer, when other members of his class received CSC, passes a rational basis review.

#### 4. Even Assuming a Categorical Denial of CSC to All Navy Personnel in the Class of 1987, the BCNR Decision Survives Rational Basis Review

Plaintiff alleges that the BCNR did not merely deny CSC to Dr. Boyer, but to all Navy personnel in the USUHS class of 1987. Pl.'s Mot. at 6-7 ("[T]he BCNR's refusal to grant relief to any Navy personnel in the Class of 1987, including Plaintiff, is arbitrary and capricious."); Pl.'s Reply at 6 ("[T]he BCNR determined that relief should be denied to any member of the Class of 1987 . . . ."). The record is not adequate to fully support or deny plaintiff's allegation. The BCNR reported to plaintiff that:

> It is this Board's position that the AFBCMR was wrong in granting blanket relief to the Class of 1986, and that it was also wrong in granting relief to any members of the Class of 1987 regardless of recruiter misinformation.

AR at 2. Defendant's counsel, at oral argument, was not aware of any instances of the BCNR granting CSC to any members of the USUHS class of 1987. Upon this record, the court cannot conclude that the BCNR made a categorical decision regarding all applicants from the class of 1987, rather than a decision based on the evidence provided by Dr. Boyer.

Assuming, *arguendo*, that the BCNR had made a decision to deny CSC to all members of the USUHS class of 1987, plaintiff's equal protection claim still fails. Each branch of the armed services may fulfill its distinct mission using its own policies. *See Flute*, 535 F.2d at 629 (finding no "equal protection injury" when a BCNR policy was not replicated by the AFBCMR). If indeed the BCNR had decided that the balance of equities prevented any Navy member of the class of 1987 from receiving CSC that was no longer permitted by DOPMA, regardless of individual circumstances and despite the fact that some Army and Air Force members of the class of 1987 had received CSC, that decision would be rational. Such a decision could be based on a policy of compliance with changes in the law brought about by DOPMA, or a policy of not favoring certain Navy classmates in the class of 1987 over others, two rationales which were alluded to in the denial of Dr. Boyer's application. These concerns are rationally related to the legitimate state interests of controlling expenditures and maintaining morale. For this reason, even if the record clearly showed that the BCNR categorically refused CSC to all Navy members of the USUHS class of 1987, that decision, too, would pass a rational basis review.

## CONCLUSION

Because plaintiff has failed to show that the decision of the Board for Correction of Naval Records denying plaintiff constructive service credit for his years in medical school was "arbitrary, capricious, contrary to law, or unsupported by substantial evidence," *Chambers*, 417 F.3d at 1227 (citing *Haselrig*, 333 F.3d at 1355), the court grants defendant's motion for judgment on the administrative record and denies plaintiff's cross-motion.

For the foregoing reasons, it is hereby **ORDERED** that:

(1) Defendant's Motion for Judgment Upon the Administrative Record, filed August 15, 2007, is **GRANTED**;

(2) Plaintiff's Cross-Motion for Judgment on the Administrative Record, filed October 24, 2007, is **DENIED**;

(3) The Clerk's Office is directed to **ENTER** final judgment in favor of defendant, **DISMISSING** the complaint, with prejudice; and

(4) No costs.

/s/Lynn J. Bush
LYNN J. BUSH
Judge